OPPENHEIM *v.* LEO WOLF and THE PUBLIC ADMINIS-
TRATOR.

IT is no objection to a bill of interpleader, that the complainant has an interest in
respect of other property not in the suit but which might be litigated, that one
party rather than the other should succeed in the interpleader, so as to increase
his own chance of success, in respect of such other property. Such interest may
be termed an interest in the question, but not in the particular suit, and does
not prevent him from filing an interpleader.

If however the complainant be liable to either party *in respect of the specific fund*
*in dispute, beyond the question of property,* or make claims on the fund which
either of the defendants contests, it is not a proper case for an interpleader.

J. having placed goods in the hands of O., as a security for advances, obtained the
goods on a promise of other indemnity, and departed from New York to go to
Liverpool, on the 11th of March, 1841, in the steamship President. Nothing
was ever heard of the ship or of any person who sailed in her, after she left the
harbor of New York. In April, and again in May, 1841, J.'sAttorney placed
securities in the hands of O. for the promised indemnity, and directed O. to pay
the surplus to W., to whom J. was largely indebted; to which O. agreed. In
August, 1841, administration was granted on J.'s estate. There being a surplus
it was claimed from O. by W., and by the administrator of J., and each sued O.
at law for the same. The administrator did not question O's right to the in-
demnity.

*Held,* 1. That it was a proper case for a bill of interpleader by O. against the rival
claimants; and that he was under no personal obligation to W., which prevented
his resorting to that remedy.

2. That J. is presumed to have been lost at sea, before May, 1841; and the pow-
ers of his attorney were thereby terminated.

3. That the administrator was entitled to the surplus.

Facts, which are a part of the experience and common knowledge of the day, are
legitimate grounds for the judgment of the court. This principle applied to the
usual duration of voyages across the Atlantic, by steam and other packet ships.
    May, 12; May 30, 1846.

IN November, 1840, the complainant lent his notes for $3,100,
to Joseph Leo Wolf, which the latter agreed to protect; and for
that purpose he lodged merchandize with the complainant.
This was subsequently relinquished on an agreement of indem-
nity in some other mode; but before completing it, J. Leo Wolf

departed from New York for Liverpool, in the steamship President, on the 11th of March, 1841. This vessel and her ill fated passengers and crew, as it is well known, have never been heard of since her departure from this port.

In April, 1841, Louis Leo Wolf, who was the general attorney in fact of Joseph, delivered to the complainant, securities belonging to Joseph, for the indemnity agreed upon by Joseph against the advances made by the complainant to take up the notes; and in May, 1841, Louis transferred to him additional securities for the same purpose. On delivering the latter, the attorney directed the complainant to pay over the surplus, if any there were to William Leo Wolf, who was a large creditor of Joseph, and the complainant assented to make such payment.

On the 25th day of August, 1841, on proof of the facts relative to Joseph Leo Wolf's supposed death, letters of administration on his estate were granted to the public administrator in the city of New York.

There was a considerable surplus, arising from the securities transferred to the complainant, after indemnifying him; and in September or October, 1841, William Leo Wolf formally claimed such surplus from the complainant, and a like claim was made about the same time by the public administrator. Both commenced suits at law against the complainant, to recover the surplus; upon which the latter filed a bill of interpleader, paid the surplus into court, and obtained an injunction, staying the suits at law.

The administrator, in his answer, admitted the complainant's right to hold the securities, to the extent of his advances; and insisted that Joseph Leo Wolf died within a few days after the 11th of March, 1841, whereby the authority to Louis, his attorney, expired: That the attorney's direction to pay the surplus to William, was thus rendered nugatory; and the administrator claimed it as a part of Joseph's assets.

William Leo Wolf put in an answer, alleging the validity of the direction given by Louis, and insisting that the complainant, on receiving the securities, was bound by his agreement with Louis, to pay the surplus to William. He also insisted that there was no presumption of Joseph's death, prior to the transfer in

May, 1841, and the direction then given in William's favor. If there were any such presumption, then the complainant took nothing by the transfer of the securities after Joseph's death, and is liable to the public administrator for the whole securities. And on this ground, as well as the complainant's liability to William under the agreement to pay him the surplus; William insisted that the bill of interpleader could not be sustained.

*F. Griffin*, for the complainant.

*N. Chase*, for W. Leo Wolf.

*J. B. Haskin*, for the Public Administrator.

THE ASSISTANT VICE-CHANCELLOR.—Neither of the defendants, questions the position that the fund in dispute came rightfully into hands of the complainant. Nevertheless the defendant Leo Wolf contends, that the facts upon which the administrator claims the fund, if made out, will entitle him to recover from the complainant the whole amount of the original deposit of securities. I do not think that this is a necessary consequence from the case made by the administrator. It suffices to defeat W. Leo Wolf's claim to the fund, as between him and the administrator, to prove that Joseph Leo Wolf died before May, 1841. But the complainant's right to the securities, to the extent of indemnifying him for his advances for Joseph, may have been valid under the original agreement for indemnity, or he may be entitled to be subrogated to the securities in place of the merchandize which was delivered up. The answer of the administrator is consistent with such a subrogation, or with a valid substitution of the securities for the merchandize. And it is a concession of the complainant's right to indemnity out of those securities, which is binding upon the administrator.

Of course, W. Leo Wolf cannot set up, to defeat this interpleader, the existence of a demand in favor of the administrator, which the latter disclaims.

The judgment of Lord Cottenham in *Crawshay* v. *Thornton*, (2 M. & Cr. 1, 19,) cited by the defendant Leo Wolf, refers to

liabilities of the complainant, beyond the mere question of property *in the specific fund in dispute.* He did not intend to say that because the complainant, in respect of other property which was not then in contest, had an interest that one defendant should succeed rather than the other, in order to establish or promote his own chance of success when a contest should arise as to such other property; therefore he could not file a bill of interpleader, as to property in which both parties defendant conceded that he had no interest. A suit concerning the latter could have no influence upon the questions in respect of the property first mentioned. An illustration of Lord Cottenham's meaning is to be found in the instance of the acceptor of a bill of exchange, discussed in *Atkinson* v. *Manks*, (1 Cowen, 692,) where the bill being drawn in favor of B., one C. claimed the fund in the acceptor's hands. There the acceptor was under a personal obligation to B., beyond and independent of the question as to the right to the fund.

In *Mitchell* v. *Hayne*, (2 S. & S. 63,) also cited, the complainant claimed against both of the defendants, a right in the fund in contest, which was resisted by one of the defendants. It was therefore held that he had a personal question to maintain with one of the defendants, which precluded him from interpleading the two claimants.

Another objection made by W. Leo Wolf is that the complainant is under a personal obligation to pay this money to him.

In this respect the case of *Atkinson* v. *Manks*, (1 Cowen, 691, 707, 708,) is applicable. In that case, Manks held the proceeds of goods and moneys collected for Booth, and Booth drew an order on him in favor of Atkinson, for Booth's goods or the proceeds, which Manks accepted. Booth drew another order on him in favor of Holroyd; and both Atkinson and Holroyd claimed the fund. Their respective rights depended on the source of the fund, whether it was from Booth's goods or otherwise. The chancellor and the court for the correction of errors, decided that Manks could interplead Atkinson and Holroyd, notwithstanding the acceptance of the order; and Judge Sutherland delivering the opinion of the latter court, held that the acceptance was without consideration.

In this case, when Joseph Leo Wolf's agent delivered the securities to the complainant, he directed the surplus to be paid to W. Leo Wolf, to which direction the complainant assented. Or if he expressly agreed to it, the case is no stronger.

This assent or agreement, does not interfere with his interpleading a party, who sets up a right to the surplus paramount to William Leo Wolf's. If it should turn out that Joseph was dead when his agent gave the order or direction, then his administrator would have a better right than W. Leo Wolf to the surplus. So if it appeared that prior to the direction, Joseph himself had sold the surplus to some other person. On the latter's claim to it in the one case, alleging the prior sale; or on the administrator's claim in the other, alleging his death, I think the complainant would have an undoubted right to interplead them with William Leo Wolf.

I must therefore decide that the bill is properly filed, and that the complainant is entitled to his costs out of the fund.

The defendants have stipulated that the questions between them shall be decided on the pleadings and testimony now before me, and I will proceed to that branch of the case.

The decisive point is the time of Joseph Leo Wolf's death. The precise time will never be known, till the mighty deep gives up its dead at the last great day.

For the purpose in hand, we must have recourse to the dictates of common experience, and to legal presumptions. Joseph Leo Wolf departed from this port in the steamship President, on the 11th day of March, 1841. Nothing has ever been heard of the vessel, or of any of her passengers or crew, from that day to the present. The usual time for steam passages across the Atlantic from New York, has been fourteen or fifteen days, and the longest passages have not exceeded twenty-three or twenty-four days. Forty days is a long passage from hence to England, in a sailing vessel of ordinary quality; and the outward trips of our packet ships are seldom beyond thirty days, and oftener under twenty-five. These are facts forming a part of the experience and common knowledge of the day, and as such are legitimate grounds for the judgment of the court.

Now, it is very true that the ill-fated President may have

become disabled, and drifted about for weeks and weeks, before she was finally engulfed by the waves of the Atlantic. But what was her probable fate ? A regular and tolerably fair passage, would have carried her to England before the last day of March, 1841. If she had become a wreck, and had been buffeted to and fro upon the ocean, the chances would have been greatly in favor of her being seen by some one of the many sail that are constantly passing between the United States and Europe. The fact that she had the resource of both sails and steam, thus doubling her chance of making some port in case of disaster ; and the impenetrable cloud that has always hung over her end, lead the mind irresistibly to the conclusion, that she must have gone to the bottom before she had been six weeks out of New York ; and the strong probability is, that she was lost within a few days after her departure.

This is a different question from the one presented, when it is to be determined whether a sufficient time has elapsed to compel payment of an insurance on a missing vessel. There all the chances in favor of safety are suffered to expire, before the final and last step is taken, by the payment of the loss. Here the fact of the death of the party is conceded, and the inquiry is, when did it happen. In the case of the insurance, after waiting for a year from the sailing of the missing ship, and then paying the loss, it is not paid on the presumption that the vessel was lost only on the day that payment was made ; but on the supposition that she must have been lost within the longest customary period allowed for such vessels to reach their port of destination. It is a general rule, that if a ship has been missing, and no intelligence received of her within a reasonable time after she sailed, it shall be presumed that she foundered at sea. The underwriters are permitted to wait until intelligence of the missing vessel can no longer be reasonably expected. So the surrogate's court will delay the grant of administration upon the estate of one who sailed in such a vessel, while hope proclaims a chance of his safety. But when the expectation of tidings of ship and passenger is entirely exhausted, and the underwriter and the surrogate act upon the legal presumption of the loss of both; that presumption relates back to a time far anterior to the period when

such action takes place. It is a presumption founded upon common sense and experience, and leads to the conclusion that the loss occurred within the longest usual duration of a voyage from the port of departure, to that of the ship's destination ; because a loss within that time is far more probable than that the vessel after becoming disabled, should have drifted about for any considerable period, at the mercy of the waves, without encountering some other vessel, or ultimately reaching the land.

There is no fixed rule in the common law, as to the time after which a missing vessel shall be presumed to be lost. (See Park on Ins. 86, 6th ed.) In *Houstman* v. *Thornton*, (Holt's N. Pr. Rep. 242,) a vessel sailed the middle of August, 1815, from Havana for a port in Holland, the ordinary duration of which voyage was about seven weeks. The vessel was not heard of after she left Havana, and eight months from the time she sailed, an action was brought against the underwriters, and was sustained by Chief Justice Gibbs.

In an early case, *Newby* v. *Read*, (Park on Ins. 85,) the insurance was against a loss happening before the 30th of November, 1762. The ship sailed from Newcastle for Copenhagen, which was an average voyage of ten days. She was taken by a privateer, and ransomed, and then proceeded on her voyage, but was never heard of afterwards. The report omits to state when the ship sailed from Newcastle; but the trial was in the fall of 1763, and the plaintiff recovered ; so that the loss must have been presumed to have occurred before 30th November, 1762.

In *Brown* v. *Neilson*, (1 Caines, 525,) an insurance on the Almira expired on the 28th of March, 1801; the vessel sailed from Norfolk bound to New York, on the 4th of March, and she was never heard from. The usual passage between the two ports was from five to seven days, (though one instance of thirty days and another of sixty days were proved,) and vessels which sailed with the Almira arrived in ten to twelve days; but with a head wind, she would have taken more time than that for the voyage. It was proved that a violent storm took place the day after she sailed, and that on the 29th of March, there was a severe tempest all along the coast. The judge charged the jury that he

thought the rule ought to be, if the vessel did not arrive within the usual limits of the voyage she was prosecuting, she ought to be presumed to be lost; and that it would not be reasonable to calculate on the utmost or greatest limit of the voyage; and he left it to the jury to say whether the Almira was probably lost before the expiration of the policy on the 28th of March. The jury gave a verdict against the underwriters, and the court sustained the charge and the verdict. In the case cited, the action was not brought till after March, 1802; thus affording to the underwriters, a whole year for it to become perfectly certain that a loss had been sustained.

These authorities fully confirm my conviction that the steamer President must be deemed to have been lost before May, 1841, and that Joseph Leo Wolf's death must have occurred before his attorney transferred this fund to his father.

The death of the constituent terminated the attorney's authority, and his transfer was nugatory. The result is, that the surplus of the securities in the complainant's hands, was assets of Joseph Leo Wolf when he died, and must be paid over to his administrator.

Under the circumstances, I will not charge W. Leo Wolf with costs. The administrator will be allowed his costs out of the fund recovered.